UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCELLA ROSE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>SEAMLESS FINANCIAL CORPORATION INC., a Nevada Corporation; MICHAEL MCDEVITT, an individual; CHAD HAGOBIAN, an individual; JEAN-PIERRE RADTKE, an individual; PREMIERE CAPITAL ESCROW, INC., a California corporation; LUIS ANTONIO VENEGAS, an individual; and DOES 1-100,<br><br>Defendants. | Case No.: 11cv00240 AJB (KSC)<br><br>ORDER:<br><br>(1) DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT; AND<br><br>(2) DENYING DEFENDANT'S MOTION FOR RULE 11 SANCTIONS<br><br>(Doc. No. 76) |

    Presently before the Court are Defendant Chad Hagobian's ("Defendant" or "Hagobian") motion to dismiss Plaintiff's Third Amended Complaint and motion for sanctions pursuant to Rule 11. (Doc. No. 76.) Plaintiff filed a response in opposition on November 26, 2012, (Doc. No. 78), and Defendant filed a reply on December 10, 2012, (Doc. No. 80). On December 21, 2012 the Court took both motions under submission and vacated the hearing scheduled for January 10, 2013. (Doc. No. 83.) For the reasons set forth below, the Court **DENIES** Defendant's motion to dismiss and **DENIES** Defendant's motion for Rule 11 sanctions pursuant.

# *BACKGROUND*

**I.     Factual Background**

On or around April 2008, Plaintiff Marcella Rose ("Plaintiff") executed a loan in the amount of $510,000 (the "Loan").[1] The Loan was secured by a first deed of trust on the property located at 3665 Trenton Avenue, San Diego, California 92117 (the "Property"). (Doc. No. 78, Ex. 3, p. 4.) Prior to executing the Loan, Plaintiff alleges that on or about April 8, 2009, Premiere Capital Escrow, Inc. ("Premiere") requested a preliminary title report on the Property through Ms. Evelyn Ortega. Plaintiff then received a telephone call from Michael McDevitt ("McDevitt"), an individual employed by Seamless Financial Corporation, Inc. ("Seamless"). (TAC, Doc. No. 74 ¶ 19.) McDevitt requested information from Plaintiff regarding the possibility of refinancing the loan on her current mortgage. (*Id.*)

During initial conversations between McDevitt and Plaintiff, Plaintiff disclosed that she had a savings account containing approximately $85,000. (*Id.* ¶ 20.) Plaintiff also provided McDevitt with proof of income showing she received monthly social security benefits in the amount of $1,077, and pension payments in the amount of $338.83. (*Id.*) McDevitt then informed Plaintiff that if she could contribute $27,000 from her saving account up front, she could get a loan with a 3.75% interest rate fixed for fifteen years. (*Id.* ¶ 24.) Plaintiff further alleges that Seamless, through Ms. Grosser ("Grosser'), Mr. Radtke ("Radtke"), and/or McDevitt, caused Plaintiff's loan application to state that her monthly income was $9,600 ($7,800 from her pension and retirement and $1,800 a month in pension benefits) and forged her signature on the typewritten loan application documents to falsely state her monthly income to ensure she would qualify for the Loan. (*Id.* at ¶ 23.)

After the Loan documents were finalized, Plaintiff made payments on the Loan for over a year. Plaintiff then became aware that her Loan was in fact a "Pick-A-Payment" mortgage rather than a loan with a fixed interest rate of 3.75%.[2] (*Id.* ¶ 26.) Soon thereafter, the Loan payments became unaffordable and Plaintiff defaulted on the Loan. (*Id.* ¶ 26-29.) On August 11, 2009, after several unsuccessful

---

[1] The Loan was originally obtained from Wachovia Mortgage, FSB ("Wachovia") and later transferred to Wells Fargo Bank, NA ("Wells Fargo") as a result of a merger.

[2] Plaintiff further alleges that her "Pick-A-Payment" mortgage loan was an Option Adjustable Rate Mortgage ("ARM"), which had a variable rate feature, payment caps, and charged a much greater interest rate than Plaintiff was originally promised by McDevitt. (Doc. No. 74 ¶ 26.)

attempts to modify the terms of Plaintiff's Loan, foreclosure proceeding commenced against the Property. (*Id.* ¶ 30.) Shortly thereafter, the Property was sold in a short sale to avoid foreclosure. (*Id.*)

**II.     Procedural Background**

Plaintiff originally filed this action in state court on December 29, 2010, against Defendants Wachovia, Wells Fargo, Seamless, McDevitt, and Hagobian (collectively, "Defendants"). (Doc. No. 1.) The complaint contained six causes of action: (1) violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 ("RESPA"); (2) violation of the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"); (3) violation of the California Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788 *et seq.* ("Rosenthal Act"); (4) unfair competition under California Business and Professions Code §§ 17200 *et seq.* ("UCL"); (5) fraud and deceit; and (6) violation of the Elder Abuse and Dependent Adult Civil Protection Act, Cal. Welfare & Institutions Code § 15610.30 (the "Elder Abuse Act"). The first, second, and third causes of action were alleged solely against Wachovia and Wells Fargo, whereas the remaining state law causes of action were alleged against all Defendants. (*Id.*)

On February 4, 2011, Defendants removed this action to federal court on the basis of federal question jurisdiction and supplemental jurisdiction over the related state law claims. (*Id.*) On February 11, 2011, Defendant Wells Fargo filed a motion to dismiss the complaint, (Doc. No. 2), which was subsequently denied as moot after Plaintiff filed a First Amended Compliant ("FAC"). (Doc. No. 7.) On March 18, 2011, Wells Fargo moved to dismiss Plaintiff's FAC, (Doc. No. 13.), and on May 25, 2011, Plaintiff and Hagobian filed a joint motion for an extension of time for Hagobian to respond to the FAC.[3] (Doc. No. 23.) While Wells Fargo's motion to dismiss was pending, Wells Fargo and Plaintiff entered into a good faith settlement. (Doc. No. 32.) The settlement was approved by the Court on March 2, 2012, (Doc. No. 50), and Wells Fargo and the federal causes of action alleged against Wells Fargo were thereby dismissed, (Doc. No. 56).

Plaintiff filed a Second Amended Complaint ("SAC") on April 2, 2012. (Doc. No. 53.) The SAC alleged four causes of action: (1) violation of the Elder Abuse Act; (2) fraud and deceit; (3) breach

---

[3] The parties disagree over the purpose of the joint motion. Plaintiff alleges the stipulation was entered into in "an effort to avoid Mr. Hagobian [from] filing a motion to dismiss," (Doc. No. 78, p. 3:2-3), and Hagobian alleges the stipulation was entered into because Plaintiff "acknowledged that the FAC was frivolous and agreed to amend her complaint." (Doc. No. 76, p. 5:13-14.)

of fiduciary duty; and (4) unlawful, unfair, and deceptive practices under the UCL.[4]  (Doc. No. 53.)  On May 1, 2012, Defendant Hagobian filed a motion to dismiss the SAC, (Doc. No. 59), and on June 1, 2012, Plaintiff filed a motion to remand, (Doc. No. 61).  On September 10, 2012, the Court denied Plaintiff's motion to remand and granted in part and denied in part Defendant's motion to dismiss the SAC.  (Doc. No. 73.)  The Court granted Hagobian's motion to dismiss with respect to the first three causes of action without leave to amend, and granted the motion with leave to amend with respect to the fourth cause of action alleging violation of the UCL.  Plaintiff filed a Third Amended Complaint ("TAC") on October 10, 2012.  (Doc. No. 74.)  On November 2, 2012, Defendant filed the two motions presently before the Court.  (Doc. No. 76.)  Each will be discussed in turn.

## *DISCUSSION*

### I.   Motion to Dismiss

Hagobian argues the Court should dismiss the only remaining cause of action alleged against him in the TAC because it is unintelligible, pled without particularity, and cannot be advanced based solely on his position as the designated broker of Seamless.  For the reasons set forth below, the Court finds Plaintiff has pled sufficient facts—at this stage in the proceedings—to allege an agency relationship between Hagobian and Radtke, and a plausible claim for relief under the unlawful, unfair, and fraudulent prongs of the UCL based on an alleged violation of TILA.

####   A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation and citation omitted).  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the pleadings and allows a court to dismiss a complaint upon a finding that the plaintiff has failed to state a claim upon which relief may be granted.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The court may dismiss a complaint as a matter of law for: (1) "lack of cognizable legal theory," or (2) "insufficient

---

[4] The SAC named Seamless, McDevitt, Hagobian, Radtke, Premiere, and Luis Antonio Venegas ("Venegas") as defendants. Defendants Radtke, Premiere, and Venegas were added as additional defendants by Plaintiff for the first time in the SAC.

facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). However, a complaint survives a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Notwithstanding this deference, the reviewing court need not accept "legal conclusions" as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). It is also improper for the court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). On the other hand, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950. The court only reviews the contents of the complaint, accepting all factual allegations as true, and drawing all reasonable inferences in favor of the nonmoving party. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009) (citations omitted).

Federal Rule of Civil Procedure 9(b) states that an allegation of "fraud or mistake must state with particularity the circumstances constituting the fraud." The "circumstances" required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other details of the alleged fraudulent activity."). In addition, the allegations "must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106. Rule 9(b)'s heightened pleading standard applies not only to federal claims, but also to state law claims brought in federal court. *Id.* at 1103. This heightened pleading standard ensures that "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985); *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995).

**B.   Defendant Hagobian's Liability under the UCL**

Hagobian's primary contention is that he is neither directly or vicariously liable for any of the alleged wrongful conduct. Hagobian argues he is not directly liable because he was not Plaintiff's broker, had no direct contact with Plaintiff, and did not review Plaintiff's Loan documents. Second, and more hotly contested in the instant motion, Hagobian argues he is not vicariously liable for any of the

alleged wrongdoing because, as a matter of law, a "designated broker" is not personally liable for the failure to supervise corporate employees, and Plaintiff has not sufficiently pled the existence of an agency relationship.

This precise issue was considered by the United States Supreme Court on appeal from the Ninth Circuit in *Meyer v. Holley*, 537 U.S. 280 (2003), reconsidered by the Ninth Circuit on remand in *Holley v. Crank*, 400 F.3d 667 (9th Cir. 2005) (*Holley II*), and recently analyzed in a case similar to the present action by the California Court of Appeal in *Sandler v. Sanchez* (2012) 206 Cal. App. 4th 1431. Based on this case law, it is now well established that a designated broker is not personally liable for the acts of corporate employees based "solely" on his or her failure to supervise. *Sandler*, 206 Cal. App. 4th at 1444-45. However, a designated broker may be held vicariously liable for the misconduct of corporate employees in accordance with traditional agency principles. *Meyer*, 537 U.S. at 291-92. Because this issue is central to Hagobian's present motion, the Court sets forth the governing law regarding real estate brokers, followed by the standard for pleading vicarious liability at the motion to dismiss stage.

### 1. Governing Law Regarding Real Estate Brokers

In California both corporations and individuals are required to be licensed to operate as real estate brokers.[5] *See* Cal. Bus. & Prof. Code §10006. However, if a corporation holds a real estate broker license it must delegate to an officer of the corporation to serve as the "designated broker." *See* Cal. Bus. & Prof. Code §§ 10158, 10211; *see also* Cal. Code Regs., tit. 10, § 2740 ("[n]o acts for which a real estate license is required may be performed for or in the name of, a corporation when there is no officer of the corporation" licensed under § 10211). Under Section 10159.2(a), the designated broker is "responsible for the supervision and control of the activities conducted on behalf of the corporation by its officers and employees . . . including the supervision of salespersons licensed to the corporation in the performance of acts for which a real estate license is required." Failure to comply with Section

---

[5] California defines a real estate broker as a person who, for a compensation or in expectation of a compensation, assists people in certain statutorily defined licensed activity, including soliciting borrowers or lenders or performing services for borrowers or lenders in connection with loans secured by real property. *See* § 10131, subds.(a), (d).

10159.2 is grounds for the Real Estate Commission to suspend or revoke the designated broker's real estate license. *See* Cal. Bus. & Prof. Code §10177(h).[6]

In *Holley v. Crank*, 258 F.3d 1127 (9th Cir. 2001) (*Holley I*), *rev'd*, 537 U.S. 280 (2003), the Ninth Circuit reversed the decision of the district court, and held that a designated broker may be held vicariously liable for an employee's violations of the Fair Housing Act, based solely on the designated broker's ability to direct or control the conduct of the employee.[7] In doing so, the *Holley I* court relied on Section 10159.2, and the purpose and express language of the Fair Housing Act, stating that: "If Meyer was indeed an officer of the corporation and the designated officer/broker of Triad Realty at the time of the alleged conduct, it is difficult to see how he could be excused from the obligation imposed by the [Fair Housing Act] to prohibit discrimination in the housing field." 258 F.3d 1127, 1135. The Supreme Court reversed, finding that nothing in the Fair Housing Act suggested a congressional intent to expand traditional principles of vicarious liability. *Meyer*, 537 U.S. at 286. The Supreme Court held that Section 10159.2's duty to supervise was not—by itself—sufficient to create a principal-agent relationship between a designated broker and the corporation's employees. *Id*. at 290-91 ("the 'right to control' is insufficient by itself, under traditional agency principles, to establish a principal/agent or employer/employee relationship."). However, because the Ninth Circuit did not address "whether other aspects of the California broker relationship, when added to the 'right to control,' would, under traditional legal principles and consistent with the 'general common law of agency,' establish the necessary relationship," the Supreme Court did not consider what facts were necessary to create an agency relationship in this context. *Id*. at 292.

---

[6] Prior to the enactment of Section 10159.2 there was not an explicit duty on behalf of the designated broker to supervise the corporate broker's employees. In March 1979, the Department of Real Estate sponsored legislation to add Sections 10159.2 and 10177(h), which made the designated broker statutorily responsible for supervision of the corporation's employees, and subject to discipline for the breach of such duty. *See* Historical and Statutory Notes, 4B West's Ann. Bus. & Prof. Code (2008 ed.) foll. § 10177 p. 194.

[7] In the *Holley* line of cases, an interracial couple sued their corporate real estate broker, Triad, and Triad's designated officer, David Meyer, alleging Triad's real estate salesperson, Grove Crank, violated racial discrimination prohibitions in the federal Fair Housing Act. The complaint sought to hold Meyer, who was also the owner and president of Triad, and Triad itself vicariously responsible for Crank's violation. The case originated in the Central District of California, 1999 WL 34789281 (C.D. Cal. Jul. 26, 1999).

On remand, the Ninth Circuit considered the question left unresolved by the Supreme Court—whether, based on all the evidence presented on summary judgment, the designated broker (Meyer) could be held liable for the corporate employee's (Crank) unlawful conduct under traditional agency principles. *Holley*, 400 F.3d 667, 669 (9th Cir. 2004) (*Holley II*). After considering all the evidence, the *Holley II* court held that an agency relationship was present between Crank and Meyer, such that Meyer could be held vicariously liable for the unlawful conduct of Crank. *Id*. at 673-74. The *Holley II* court based this determination in part on the fact that Meyer intended to turn the real estate enterprise over to Crank to pursue an alternate career; Meyer understood his supervisory duty under California law and agreed to delegate such duties to Crank; and Crank agreed to carry out this duty on behalf of Meyer, subject only to Meyer's ultimate control. *Id.*

The California Court of Appeal recently considered a similar issue in *Sandler v. Sanchez,* wherein the plaintiff attempted to impose vicarious liability on a designated broker by alleging that the broker "implicitly" agreed to delegate his duty to supervise to a corporate employee. *Sandler v. Sanchez* (2012) 206 Cal. App. 4th 1431, 1445. Pleading facts similar to those alleged in the *Holley* line of cases, the plaintiff in *Sandler* argued that because the designated broker had no involvement in the day-to-day activities of the corporation, he effectively lent his license to the corporation, which in essence delegated his statutory duty to supervise. *Id.* Accordingly, the plaintiff in *Sandler* argued that if the alleged wrongful conduct was committed by the corporate employee within the scope of the agency, the designated broker should be held vicariously liable. *Id.* The Court of Appeal rejected the plaintiff's analogy, finding that to the extent the Ninth Circuit found an "express agreement" between Meyer and Crank, it did so based on the Supreme Court's finding that "more is needed to create such a unique agency relationship between two employees than the [designated broker's] mere inaction." *Id*. ("Even if such a relationship could exist, as the United States Supreme Court explained, more is needed to create such a unique agency relationship between two employees than the officer's mere inaction.")

Based on the above mentioned cases, imposition of liability on a designated broker depends on whether or not an agency relationship has been created between the designated broker and the corporate employee alleged to have committed the unlawful conduct. Mere inaction on behalf of the designated broker, or allegations of an "implicit agreement" is not sufficient. *Id.*

### 2.     Vicarious Liability and Agency Principles

As a general rule, corporate employers may be held vicariously liable for the acts of their agents committed within the scope of the agency or employment. *See Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967. However, absent an independent agency relationship, it is the corporation—not its owner or officer—that is subject to vicarious liability for the unlawful conduct committed by its agents or employees. *See Holley*, 537 U.S. at 286 ("[a] corporate employee typically acts on behalf of the corporation not its owner or officer"); *United States Liability Ins. Co. v. Haidinger–Hayes, Inc.* (1970) 1 Cal.3d 586, 595 (same).

Under traditional agency principles, a principal may be liable for the acts of his agent if the principle consents to the "agent acting on his behalf and subject to his control, and the agent [consents] to act for the principal." *Holley II*, 400 F.3d at 673; Restatement (2d) of Agency § 1. Accordingly, the "ordinary principal/agency relationship demands not only control (or the right to direct or control) but also 'the manifestation of consent by one person to another that the other shall act on his behalf . . . and consent by the other so to act.'" *Nevis v. Wells Fargo Bank*, 2009 WL 1458042 * 4 (N.D. Cal. May 26, 2009) (citing *Holley*, 537 U.S. at 286). Thus, in the designated broker context, the designated broker's right to control the employee/salesperson is not enough; there must be a finding of an explicit agreement between the principal and the agent. *Holley*, 537 U.S. at 291. 292; *Holley II*, 400 F.3d at 670-75.[8]

### 3.     Hagobian May be Vicariously Liable For the Unlawful Conduct of Radtke

Here, Plaintiff does not allege any actual misconduct on behalf of Hagobian in the solicitation, preparation, or execution of Plaintiff's Loan. Nor does Plaintiff allege that Hagobian was aware of the alleged wrongful conduct and ratified such conduct after the fact. Instead Plaintiff argues that Hagobian is vicariously liable for the alleged misconduct because: "Mr. Hagobian consented to Mr. Radkte acting on Mr. Hagobian's behalf, and [] Mr. Radkte consented to act for Mr. Hagobian . . ." (TAC ¶ 8.) Thus, Plaintiff alleges that because there was an actual agreement between Hagobian and Seamless—that Hagobian would review loan documents each week, and Radtke and Noland Nelson would be responsible for the day-to-day supervision of the corporations employees, including McDevitt—Hagobian is

---

[8] The Supreme Court also noted that an agency relationship could exist under a "piercing the corporate veil" or "independent contractor" theory. *Meyer*, 537 U.S. at 291. However, the Court need not address these as Plaintiff does not raise factual allegations that would support either claim.

vicariously liable for other Defendants, more specifically Radtke's, failure to comply with TILA.[9] (Dickenson Decl. ¶3.) Moreover, Plaintiff distinguishes *Sandler v. Sanchez* (2012) 206 Cal. App. 4th 1431, a case relied on by Hagobian, stating that where the plaintiff in *Sandler* alleged an "implicit" agreement between the designated broker and the corporate employee, here Plaintiff alleges there was an "actual" agreement between Hagobian and Radtke to ensure compliance with TILA.[10] (Doc. No. 78, p. 11.)

Therefore, although Hagobian ardently contends that Plaintiff raises the notion of an agency relationship between Hagobian and Radtke as a "sham" to "artfully" plead around the clear bar to recovery against Hagobian, the Court finds Plaintiff has sufficiently plead—at this stage in the proceeding—an agency relationship between Hagobian and Radtke. *Seneris v. Haas* (1955) 45 Cal.2d 811, 831 ("Unless the evidence is susceptible of but a single inference, the question of agency is one of fact for the jury"); *Dion LLC v. Infotek Wireless, Inc*., No. C07–1431 SBA, 2007 WL 3231738 at *4 (N.D. Cal. Oct. 30, 2007) (denying motion to dismiss vicarious liability claim where plaintiffs alleged agency relationship between parties without additional factual allegations); *but compare Hawkins v. First Horizon Home Loans*, 2010 WL 4823808 (E.D. Cal. Nov. 22, 2010) ("[P]laintiffs do not allege any facts to show how Horizon authorized any other defendant to represent and/or bind it. Plaintiffs must allege such facts to sufficiently apprise defendants of the nature of the agency relationship."). Accordingly, even though Hagobian is not directly liable under Cal. Bus. & Prof. Code § 10240, because Seamless, and not Hagobian was Plaintiff's broker, Plaintiff's claim under the UCL, and more specifically alleged violations of TILA, may proceed under a theory of vicarious liability.

### C. Unfair Competition Under California Business and Professions Code § 17200

Plaintiff alleges Hagobian violated the UCL by failing to ensure the TILA disclosures ("TILDS") provided to Plaintiff were clear and conspicuous. Section 17200, also known as California's

---

[9] Plaintiff must be cognizant however that she has only alleged an explicit agency agreement between Radtke and Hagobian.

[10] Hagobian contends there was no such agreement. (Doc. No. 80, p. 9 n. 7.) However, for purposes of the present motion, the Court must take Plaintiff's allegations as true. Nevertheless, Plaintiff must be cognizant that as the Ninth Circuit noted in *Holley II*, and the Supreme Court noted in *Meyer*, special circumstances—beyond the mere right to control—must be present to impose vicarious liability on a designated broker.

"Unfair Competition Law," prohibits "any unlawful, unfair or fraudulent" business practices. "Since section 17200 is [written] in the disjunctive, it establishes three separate types of unfair competition. The statute prohibits practices that are either 'unfair' or 'unlawful,' or 'fraudulent.' " *Pastoria v. Nationwide Ins.* (2003) 112 Cal. App. 4th 1490, 1496; *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal. 4th 163, 180. Plaintiff's alleges Defendants' conduct was unlawful, unfair, and deceptive.[11]

### 1. "Unlawful" Prong

Plaintiff alleges Hagobian's conduct is unlawful because it violates TILA and its accompanying regulations, codified at 12 C.F.R. § 226.1 *et seq.* Specifically, Plaintiff alleges Hagobian violated 12 C.F.R. § 226.19, by failing to provide the requisite notices of right to cancel or clearly and conspicuously disclose the certainty of negative amortization and its effect on the payment cap. Although Plaintiff does not set forth whether she is seeking rescission or damages under TILA, because the Property was sold at a foreclosure sale in 2009, rescission is no longer available.[12] Therefore, the Court infers Plaintiff seeks damages pursuant to § 1640(a), and violation of, among other TILA provisions, 12 C.F.R. § 226.19(b)(2)(vii), which regulates disclosure requirements relating to negative amortization and explanation of interest rate or payment limitations.[13]

TILA was enacted by Congress to "avoid the uninformed use of credit." 15 U.S.C. § 1601. Through TILA, Congress "sought to protect consumers' choice through full disclosure and to guard against the divergent, and at times, fraudulent practices stemming from uninformed use of credit." *King*

---

[11] Plaintiff's allegations under the UCL allege wrongful conduct against Defendants Seamless, McDevitt, Radtke, Premiere Capital, Venegas, and Hagobian. Allegations against Hagobian only concern violation of TILA.

[12] *See* 15 U.S.C. § 1635(f) ("An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first . . ."); *Jacobson v. Balboa Arms Drive Trust No. 5402 HSBC Fin. Tr.*, No. 10–CV–2195–JM (RBB), 2011 WL 3328487 *6 (S.D. Cal. Aug. 1, 2011) ("any right of rescission under TILA is terminated upon foreclosure sale of the property").

[13] The Court's prior order dismissing Plaintiff's SAC instructed Plaintiff to allege "which specific section or sections [of TILA] were allegedly violated." (Doc. No. 73, p. 13:22-24) Although Plaintiff's TAC did not clearly allege which specific section of TILA was violated, she did provide a description of the alleged wrongful conduct and provided the Court and Defendant with the implementing regulation she believed was violated. Therefore, even though Defendant's Reply points out that TILA has 77 sections and C.F.R. § 226.19 has 31 subparts, in an abundance of caution, and to ensure this case is resolved on its merits, the Court finds Plaintiff's allegations sufficient.

*v. California*, 784 F.2d 910, 915 (9th Cir. 1986).  In order to effectuate this purpose, TILA "has been liberally construed" in the Ninth Circuit.  *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989) (citing *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 650 (9th Cir. 1974)).  Even "technical or minor violations" of TILA impose liability on the creditor.  *Id.* (quoting *Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 704 (9th Cir.1986)) (finding that TILA and its implementing regulations, must be "absolutely complied with and strictly enforced").  Regulation Z of the Federal Reserve Board of Governors, codified at 12 C.F.R. § 226.1 *et seq.*, implements TILA and imposes specific disclosure requirements on creditors in connection with certain loans.  As applicable to this case, Regulation Z requires that the possibility of negative amortization must be clearly disclosed to the borrower, and that no disclosure may cause another disclosure to be obscured or made ambiguous.  *See* 12 C.F.R. Pt. 226, Supp. I, ¶ 17(a)(1)–1.

Plaintiff claims Hagobian violated 12 C.F.R. § 226.19—which imposes specific disclosure requirements in connection with variable rate mortgages—by failing to clearly and conspicuously disclose: (1) that negative amortization was certain to occur; and (2) the effect of the payment cap. (TAC ¶ 56.)  Subsection 226.19(b)(2)(vii) requires lenders to disclose "any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover." The Official Staff Commentary to this subsection elaborates on the requirement with respect to negative amortization:

> Negative amortization and interest rate carryover. A creditor must disclose, where applicable, the possibility of negative amortization.  For example, the disclosure might state, "If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount." . . . If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase) . . .

C.F.R. Pt. 226.19(b)(2)(vii)(2). Many courts in the Ninth Circuit have interpreted this to mean that a borrower states a claim for violation of TILA, based on, among other deficiencies in related disclosures, the failure of the lender to clearly state that making payments pursuant to the TILDS payment schedule

will result in negative amortization.[14] Accordingly, where disclosures framed negative amortization as merely a possibility—and were literally accurate—the failure to state that paying less than the full amount due under the Note would result in negative amortization, violates TILA. *Velazquez v. GMAC Mortgage Corp.*, 605 F. Supp. 2d 1049, 1067 (C.D. Cal. 2008)

Moreover, Section 226 applies equally to all loan documents, including but not limited to, the TILDS and the actual note. This is to ensure consumers are not confused as a result of inconsistent disclosures in various loan documents. *See, e.g., Amparan v. Plaza Home Mortgage, Inc.,* 678 F. Supp. 2d 961, 969-70 (N.D. Cal. 2008); *Plascencia v. Lending 1st Mortg.*, No. C 07–4485 CW, 2008 WL 1902698, at *4–6 (N.D. Cal. Apr. 28, 2008) (denying motion to dismiss § 226.19 claim predicated on alleged lack of clarity in note agreement with respect to disclosure of APR and possibility of negative amortization); *Handy v. Anchor Mortgage Corp.*, 464 F.3d 760, 764 (7th Cir. 2006) (noting that where a lender provided a borrower with both a correct and an incorrect disclosure, the disclosure was unclear in violation of TILA).

Here, the TILDS Plaintiff received and signed on April 10, 2008, represented that the APR was 3.376%, describing this figure as the "[t]he cost of your credit as a yearly rate." (Doc. No. 78; Ex. 2.) The TILDS also stated an amount financed of $525,869.52, with payments in the amount of $2,328.35, starting on July 1, 2008. (*Id.*) However, the Note signed by Plaintiff on April 25, 2008, represented that "I will pay interest at the yearly rate of 8.000%." (*Id.*; Ex. 3.) The Note also stated an amount financed of $510,000.00, with payments in the amount of $2,219.56, starting on June 1, 2008.[15] Thus, as acknowledged by Hagobian in his Reply, it is unclear if the TILDS proffered by Plaintiff bears any

---

[14] *See, e.g., Romero v. Countrywide Bank, N.A.*, 740 F. Supp. 2d 1129, 1132–1133, 1136–1141 (N.D. Cal. 2010); *Ralston v. Mortgage Investors Group, Inc.*, No. C 08–536 JF, 2009 WL 688858, *1–*2, *5–*6 (N.D. Cal., Mar. 16, 2009); *Velazquez v. GMAC Mortgage Corp.*, 605 F. Supp. 2d 1049, 1053–1056, 1064–1066 (C.D. Cal. 2008); *Pham v. T.J. Financial, Inc.*, No. CV 08–275 ABC, 2008 WL 3485589, *2–*4 (C.D. Cal., Aug. 11, 2008); *Plascencia v. Lending 1st Mortgage*, No. C 07–4485 CW 2008 WL 1902698, *1–*6 (N.D. Cal., Apr. 28, 2008).

[15] Defendant's Reply objects to the introduction of the TILDS statement and the Note as extrinsic evidence that may not be considered by the Court on a motion to dismiss. (Doc. No. 80, p. 5:15-22.) However, certain written instruments attached to pleadings may be considered part of the pleading. *See* Fed. R. Civ. P. 10(c). Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. *See Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir.2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.1994). Here, the basis of Plaintiff's claims concern the alleged TILA violation, she referred to these documents in the TAC, and attached them to her Opposition.

relationship to the Note, or whether Plaintiff received an additional TILDS from Wachovia before signing the Note. (Doc. No. 80, p. 6 n. 4.) Accordingly, at this stage in the proceeding, this inconsistency renders the disclosure of the actual APR unclear, and substantiates Plaintiff's factual allegations under TILA.

Moreover, Paragraph 3(B) of the Note states: "My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and *may not be sufficient* to pay the entire amount of interest accruing on the unpaid Principal balance." (Doc. No. 78; Ex. 3) (emphasis added). Paragraph 3(E) states that: "From time to time my monthly payments may be insufficient to pay the total amount of the monthly interest that is due. If this occurs, the amount of interest that is paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal." Finally, Paragraph 3(D) states that: "my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance together with interest. . ." However, Paragraph 3(D) never sets forth the margin that will be added to the index rate to determine the new interest rate upon the change date. Taken together, this language infers that negative amortization could occur if the minimum payment selected by the lender does not cover the applicable interest, but does not appear to provide the necessary clarity required under case law in this circuit. Accordingly, in addition to the discrepancies noted above between the TILDS and the Note, the Court finds Plaintiff has alleged a plausible cause of action for violation of TILA and 12 C.F.R § 226.19.

### 2. "Unfair" Prong

Second, Plaintiff alleges Defendants' conduct constitutes an unfair business practice because the deceptive nature of the disclosure documents caused substantial injury that was not outweighed by any benefits to consumers, and the disclosures were designed to be misleading to induce Plaintiff, and other consumers like Plaintiff, to enter into loan transactions. (TAC ¶ 57.) Hagobian alleges Plaintiff's claim must fail because she does not plead the allegation with particularity, and as a matter of law, Hagobian has no legal duty to make any disclosures to Plaintiff.[16] Here, even though California appellate courts

---

[16] Defendant cites to the Court's prior order dismissing claims one, two, and three, for Elder Abuse, fraud and deceit, and breach of fiduciary duty, respectively. (Doc. No. 73.) However, the Court's order never stated Hagobian did not owe Plaintiff a duty under TILA—with respect to the UCL claim—and dismissed the other claims based on reasons not associated with Hagobian's duty to make

disagree on how to define an "unfair" act or practice in the context of a UCL consumer action, because the Court finds Plaintiff has alleged a violation of TILA, she may be able to prove facts showing that "the harm to the consumer" from Defendants' conduct outweighed the solicitation's 'utility.' " *Rubio v. Capital One Bank,* 613 F.3d 1195, 1205 (9th Cir. 2010) (finding that borrower who alleged a violation of TILA also alleged a violation of the "unfair" prong under either the test currently employed by California courts.)  Accordingly, the Court finds Plaintiff has also alleged a violation under the unfair prong.

### 3. "Deceptive/Fraudulent" Prong

Finally, Plaintiff alleges Defendants' conduct was fraudulent in that the "disclosures were incomplete and deceptive, and that the true facts with respect to Plaintiff's loan were not disclosed to Plaintiff, so as to induce Plaintiff to fork over $27,000 for a loan she could not afford."  (*Id*. at ¶ 58.)  Plaintiff further alleges that the "public would likely be deceived and were in fact deceived because the disclosures did not explain that negative amortization was certain to incur if only the minimum payments were made."  (*Id.* at ¶ 59.)  Defendant argues Plaintiff's claim must fail because she has failed to state with particularity what specific conduct Defendant is accused of, how the conduct was deceptive, or how members of the public are likely to be deceived by the alleged conduct.[17]  The Court does not agree.

Similar to allegations under TILA, allegations under the "fraudulent prong" of the UCL are "governed by the reasonable consumer test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  In order to prevail, a plaintiff must demonstrate that "members of the public are likely to be deceived." *Id.*  The deception need not be intentional. *See In re Tobacco II Cases* (2009) 46 Cal. 4th 298.  As stated above, Plaintiff has set forth sufficient allegations to show that Defendants' conduct,

---

disclosures required by law under TILA.  Moreover, as stated above, the Court finds Plaintiff has pled sufficient facts to proceed against Hagobian under a theory of vicarious liability.

[17] Defendant further contends that "[i]t is simply beyond comprehension how Rose can take the position that she never received any disclosures, but at the same time state she was deceived by the language in the disclosures, then also opine that the public would be deceived by the unidentified language in the disclosures."  Although the Court agrees with Defendant that Plaintiff's allegation is misleading, as Plaintiff attaches a TILDS to her opposition, the Court is willing to infer that Plaintiff was inferring that she never received a TILDS that identified an interest of 8%, the same interest rate for the Note.

including the inconsistent disclosure statements, were misleading, and would be misleading to the reasonable consumer. Accordingly, because of the inconsistencies in the TILDS and the Note, and the equivocal language regarding the possibility of negative amortization, the Court finds Plaintiff has stated a plausible claim under the fraudulent prong.

## II. Motion For Sanctions Pursuant to Rule 11

Defendant seeks Rule 11 sanctions in the form of dismissing the action as to him with prejudice, or in the alternative, striking the TAC as to him, and awarding his reasonable attorneys' fees and expenses incurred in defending against the TAC. In response, Plaintiff contends sanctions are not procedurally or substantively warranted, and requests the Court order Defendant and his counsel to show cause as to why their conduct has not violated Rule 11.

As stated above, because Plaintiff has sufficiently alleged a non-frivolous claim, the Court finds sanctions unwarranted. Fed. R. Civ. P. 11(b); *Warren v. Guelker*, 29 F.3d 1386, 1388 (9th Cir. 1994) (Rule 11 sanctions are warranted when a party files a lawsuit or motion that is frivolous, legally unreasonable, without factual foundation, or is otherwise brought for an improper purpose). The Court also declines Plaintiff's request to issue an order to show cause as to why sanctions should not be imposed against Hagobian and his counsel. Nonetheless, as this case progresses, counsel for both parties are reminded of the importance of professional courtesy, and the benefit of continuing discussions to facilitate settlement for the benefit of their clients.

### *CONCLUSION*

For the reasons stated above, the Court **DENIES** Defendant Hagobian's motion to dismiss and **DENIES** Defendant Hagobian's motion for Rule 11 sanctions. Defendant Hagobian shall file an answer within thirty (30) days of service of this Order.

IT IS SO ORDERED.

DATED: January 2, 2013

_____
Hon. Anthony J. Battaglia
U.S. District Judge